**William GEORGE, Plaintiff,**

v.

**ASSOCIATED STATIONERS,**
**et al., Defendants.**

**No. 1:95CV1345.**

United States District Court,
N.D. Ohio,
Eastern Division.

June 3, 1996.

Craig Douglas Lovett, Cleveland, OH, for plaintiff.

Victor Thomas Geraci, Buckingham Doolittle & Burroughs, Cleveland, OH, for defendants.

## MEMORANDUM AND ORDER

HEMANN, United States Magistrate Judge.

This case was filed pursuant to the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601, et seq. (the "Act"). Pending are cross-motions for summary judgment on the issue of liability. The legal issues raised by the parties' motions are discrete: 1) is chicken pox a "serious illness" within the Act, and 2) is defendants' attendance policy a violation of the Act on its face or as applied? For the reasons set forth below, plaintiff's motion for summary judgment is granted and defendant's motion is overruled.

### I.

The undisputed facts are as follows. Plaintiff, William George ("George"), was employed by defendant Associated Stationers, Inc. (the "Company")[1] beginning January 3, 1994. George was part of the "flex-force" team, seasonal employees hired by the Company to perform warehouse duties. George worked approximately 37 hours per week. Beginning in February 1994 George had attendance problems. Specifically, between February 9, 1994 and December 12, 1994 George was absent six days, late three days and worked only four hours on one day. On December 15, 1994 George was given a written warning concerning his attendance. The letter, written by George's supervisor, Marco DeSciscio, states in part:

> December 12th,· [sic] marked your fifth occurrence[2] and there was no way possible to allow an emergency vacation day. We do not allow emergency vacation days when an employee is beyond three occurrences and in a potential disciplinary situation.
>
> William[,] in a 10 month period you have progressed to a very critical point in your career at A.S.I. because of attendance. At one time you had expressed an interest in becoming a full time member of this organization. Please understand that your chance for full time with this many occurrences is extremely slim. Also another occurrence will result in further disciplinary action up to and including termination.

On December 31, 1994 George began to feel ill. Affidavit of William George ("George Aff.") at ¶ 3. He was feverish, nauseous and weak. His condition worsened on January 1 and 2, 1995. *Id.* On January 3, 1995 George awakened to find his skin covered with vesicles. George Aff. at ¶ 2. George recently had been visited by his son; his son had similar vesicles and had been diagnosed with chicken pox. George telephoned DeSciscio on January 3 and told him that he could not work because he was ill with chicken pox.

After speaking with George, DeSciscio spoke with Tony Pelcic, distribution supervisor for the Company. Pelcic spoke with Rodolfo Mayo, area manager. Among the three of them, the decision was made, based on company policy, to terminate George's employment. George was notified of the decision by DeSciscio.

For the next day or so (January 4 and 5) George's condition remained the same; he was weak and spent "almost all the time lying in bed or on the couch." George Aff. at ¶ 3. On January 6 his wife drove him to the

1. Associated Stationers, Inc. was purchased by United Stationers Supply Co., Inc. in 1995. Plaintiff's amended complaint names United as a defendant.

2. Apparently the Company did not count George's absence on February 9, 1995 against him. This raises the question of whether the company correctly applied its policy as written. A sixth "occurrence" is to give rise to a suspension, not a termination. See p. 4, *infra.*

Meridia Huron Hospital emergency room, where he was examined and his diagnosis of chicken pox was confirmed. George testified that he did not go to the emergency room earlier because he was physically unable to. George was told to remain off work until all vesicles were dry and to call the medical clinic for an appointment the following week. Richard Frires, M.D., who saw plaintiff on January 6, submitted an affidavit in support of plaintiff's motion in which he states, "In light of his condition, Mr. George would have had to have been isolated from at least the time of the appearance of the vesicles, and continuing through the time when the last vesicles dried up, a period usually lasting some six days. During that time he would have been unable to work at all." Affidavit of Richard Frires, M.D. ("Frires Aff.") at ¶ 5. Dr. Frires further opined, "It was clear at the time of his January 6 visit that Mr. George had contracted the disease at least three or four days before January 6, and possibly more. Had he presented himself earlier, at the time of the first appearance of the vesicles, he similarly would have been instructed not to return to work until the symptoms subsided." *Id.* at ¶ 6. Dr. Frires opined that because the skin vesicles were evident at the time of George's visit on January 6, his was a "highly contagious condition" and thus he was unable to go to work until the period of contagion had passed. In a letter to plaintiff's counsel dated February 19, 1996, which Dr. Frires incorporated into his affidavit, Dr. Frires stated, "[Chicken pox] is most contagious during the short prodrome (3 to 4 days before the first series of skin lesions appear) and early stages of the eruption. Communicability to others is considered possible from 10 to 21 days after exposure.... Isolation for 6 days after the first vesicles appear is usually sufficient to control cross-infection." Exhibit to B to Frires' Aff.

George returned to the Meridia Huron Clinic on February 1, 1995 for a follow-up examination, as instructed by Dr. Frires. He was told he could return to work at any time without restrictions.

Defendants admit that they knew George did not report to work because of chicken pox and offer no evidence that he did not have the disease as of January 3, 1995. They admit that George was terminated because of the company's policy with respect to attendance. That policy states, in relevant part:

Occurrences will be recorded and will result in the following action:

On the 4th occurrence there will be a discussion with the employee and his/her supervisor. On the 5th occurrence the employee will be put on a 60 day probation period and a letter will be given to the employee and placed in his/her file. On the 6th occurrence the employee will be suspended for 3 days without pay and a letter will be placed in his/her file stating the reason for the suspension. On the 7th occurrence, at the discretion of management, the employee's employment with A.S.I. will be terminated.[3]

There is no definition of an "occurrence" in the record, and no statement that an "occurrence" includes an absence for a medical leave.

## II.

Title 29 § 2612(a)(1) states, in relevant part:

Subject to section 2613 of this title, an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12–month period for one or more of the following:

(D) Because of a serious health condition that makes the employee unable to perform the functions of the position of such employee.

Section 2611(11) defines the phrase "serious health condition":

The term "serious health condition means an illness, injury, impairment, or physical or mental condition that involves—

(A) inpatient care in a hospital, hospice, or residential medical care facility; or

---

3. A copy of these Flex Force Attendance Guidelines is attached to Pelcic's deposition as Plaintiff's exhibit 2. The guidelines are not part of the employee handbook but instead appear in the form of an Interoffice Memo.

(B) continuing treatment by a health care provider.

"Continuing treatment by a health care provider" is explained at 29 C.F.R. § 825.114(a):

(2) *Continuing treatment* by a health care provider. A serious health condition involving continuing treatment by a health care provider includes any one or more of the following:

(I) A period of *incapacity* (*i.e.*, inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefor, or recovery therefrom) of more than three consecutive calendar days, and any subsequent treatment or period of incapacity relating to the same condition, that also involves:

(A) Treatment two or more times by a health care provider, by a nurse or physician's assistant under direct supervision of a health care provider, or by a provider of health care services (*e.g.*, physical therapist) under orders of, or on referral by, a health care provider; ...

"Treatment" is defined as including "(but not limited to) examination to determine if a serious health condition exists and evaluations of the condition." 29 C.F.R. § 825.114(b).

The Regulations offer little guidance as to the anticipated scope of "serious medical condition." Section 825.114(c) excludes from the definition cosmetic treatments and "ordinarily" the common cold, flu, ear aches, upset stomach, minor ulcers, headaches other than migraine, routine dental and orthodontia problems and periodontal disease. The legislative history sets forth a general test for determining exclusions, "minor illnesses which last only a few days and surgical procedures which typically do not involve hospi-

talization and require a brief recovery period." S.Rep. No. 3, 103d Cong., 1st Sess. (1993), *reprinted in* 1993 U.S.C.C.A.N. 3, 30. Such minor illnesses, opined the drafters, were likely to fall within a company sick leave policy.[4] The Senate Report makes specific reference to including such conditions as heart attacks, cancer, strokes, spinal injuries, appendicitis, and other like conditions within the definition of "serious health condition."

### III.

Defendants, relying upon legislative history, contend that chicken pox is not a "serious medical condition." The court does not agree. The language of the statute and Regulations is clear. The Act permits an employee a total of 12 workweeks of leave where the employee has a serious medical condition which makes him unable to perform his job functions. A serious health condition is one requiring continuing treatment by a health care provider. "Continuing treatment" requires a period of incapacity of more than three consecutive calendar days and two or more examinations or evaluations by a health care provider. The Regulations do not specify a time period during which the minimum two examinations must take place.

There is no dispute here, based upon the uncontested affidavit of Dr. Frires and George's testimony, that George was contagious at least from January 3 through January 9 and under instructions by Dr. Frires not to work during at least that time period. George was examined on January 6 and evaluated on February 1, thereby satisfying the requirement of two or more treatments.[5]

Defendants argue that the Act was meant to cover only those employees with chronic or debilitating conditions. Indeed 29 C.F.R. §§ 825.114(a)(iii) and (iv) explicitly cover chronic and debilitating conditions. To the

---

4. Having seen no reference to the Company's sick leave policy, the court requested production of the company's employee handbook. While there are references in the handbook to disability leave, the court notes no references to sick leave. Indeed it appears that a sick day would constitute an "occurrence" under defendants' policies and, combined with other "occurrences," become a basis for termination. The Flex Force Attendance Guideline except only vacation day absences from the "occurrence" category.

5. The case is thus distinguished from *Seidle v. Provident Mut. Life Ins. Co.,* 871 F.Supp. 238 (E.D.Pa.1994), where the court concluded that otitis media is not a serious health condition. In that case plaintiff's son was examined only once by a physician and was not required to be absent from day care for more than three days.

contrary, 29 C.F.R. § 825.114(a)(i) does not. Defendants contend that "ailments which require only home care, rest, or over the counter drugs, do not qualify as serious health conditions." Defendants' Brief in Support of Motion for Summary Judgment [pages unnumbered]. Neither the statute nor the Regulations incorporate that test into the definition of a "serious health condition" within 29 C.F.R. § 825.114(a)(i). *See* 29 C.F.R. § 825.800, *Serious health condition* (2) (excluding bed rest, over-the-counter medication, etc. only from the "regimen of continuing treatment" reference in § 825.114(a)(2)(i)(B)). Here plaintiff had the requisite two treatments (the second examination pursuant to doctor's orders), was told by his physician that he could not work until the vesicles were covered (a period of more than three days) and was contagious until at least January 9. This is a different situation than that of an employee suffering from an ear ache or common cold.[6]

Defendants contend that "serious medical condition" requires an employee to show he cannot perform the essential functions of his job as those functions are defined by the Americans with Disabilities Act. Defendants offer no support for their position. Indeed they cannot because the Regulations state to the contrary. 29 C.F.R. § 825.702 states, "ADA's 'disability' and FMLA's 'serious health condition' are different concepts, and must be analyzed separately."

Nor is there any requirement in the law or in defendants' procedures that plaintiff already have received medical treatment at the time he gave notice of his illness to his employer or that he immediately submit a medical excuse (in fact there appears to be no reference at all to the Act in defendants' employee handbook). George contacted his supervisor the morning of January 3, thus supplying the required verbal notification that he needed the qualifying leave. He was not required to assert rights under the Act. 29 C.F.R. § 825.303(b); *Hendry v. GTE North, Inc.*, 896 F.Supp. 816, 828 (N.D.Ind. 1995). The obligation shifted to the employer to determine whether leave was sought under the Act and to obtain any additional information. *Id.* If the Company required medical certification in conjunction with a leave request, it was required to give notice of its demand to George. 29 C.F.R. § 825.305.

*Brannon v. Oshkosh B'Gosh, Inc.*, 897 F.Supp. 1028 (M.D.Tenn.1995), relied upon by defendants, supports plaintiff's position. In that case the court considered two separate illnesses to determine whether plaintiff had been wrongfully discharged in violation of the Act. It first considered plaintiff's absence for four days with gastroenteritis. Based upon the evidence, the court noted that 1) plaintiff's physician had not advised her to remain off of work and 2) there was no evidence that plaintiff was unable to perform her work. This court notes that there was no evidence that plaintiff was examined or evaluated by her physician on more than one occasion.

The *Brannon* court also reviewed plaintiff's absence from work due to the illness of her child. The child had symptoms of fever, sore throat, runny nose and vomiting. She was ill for three days before her parents took her to the emergency room, where she was diagnosed with pharyngitis and an upper respiratory infection. The child was treated with an antibiotic and over-the-counter medication, and her parents were instructed to keep her out of school until her fever went down. The child did not see a health care provider a second time. The court concluded that the child had a "serious health condition" within the Act. Based on the physician's testimony, she was not to attend day care with a fever. Her parents testified that she had a fever prior to seeing the physician; the physician indicated she had a fever when he saw her. Thus she was incapacitated for more than three days.

There is no dispute that George was diagnosed with chicken pox, a condition which, according to Dr. Frires, existed prior to his first trip to the emergency room on January 6. He was told to remain out of

---

6. In fact, it is difficult for this court to understand why defendants would have wanted someone with chicken pox to report for work and expose his fellow employees to such a contagious disease.

work until the vesicles dried, a process likely to take an additional three days. Certainly a case of chicken pox is no less serious than a respiratory infection. Thus this court concludes that George had a "serious health condition" at the time of his termination on January 3, 1995.

## IV.

Defendants argue that the Company's attendance policy is not a violation of the Act. The Company admits the following in its Brief in Support of Motion for Summary Judgment:

> As quoted previously, the attendance policy at United simply required that employees report illness, including medical documentation thereof, and that a medical leave, if properly documented, will count as one "occurrence" regardless of the length of said leave.

Brief in Support (pages unnumbered).[7] Thus the Company's attendance policy was a "no fault" policy, i.e. any absence other than that taken within vacation time was characterized as an "occurrence" and counted in the point system upon which disciplinary action was taken.

■ Defendants rely upon a series of ADA cases which have held that excessive absenteeism permits an employer to terminate an employee despite that employee's disability because presence at work is considered an "essential job function" which must be satisfied by disabled and nondisabled employees alike. There is a distinction between the intent of the ADA and the Act which precludes application of ADA analysis. The ADA is a nondiscrimination statute and thus focuses on leveling the playing field for disabled individuals to allow them to compete with nondisabled employees (hence the requirement of "reasonable accommodation"). Job presence being an essential job function for **all** employees, disabled employees must be able to fulfill that requirement.

■ The Act was designed to entitle employees to take reasonable leave for medical reasons, based upon Congressional findings that "there is inadequate job security for employees who have serious health conditions that prevent them from working for temporary periods...." 29 U.S.C. § 2601(a)(4) and (b)(2). Thus its specific purpose was to deal with situations such as the one presented here—no medical leave policy to cover absences due to sickness and the possibility of an employee being terminated based upon the accumulation of too many "occurrences."

■ The Company's policy as to calculation of "occurrences" and disciplinary actions flowing from such calculations cannot be applied to decrease an employee's rights under the Act. The Regulations specifically state:

> An employer is prohibited from discriminating against employees or prospective employees who have used FMLA leave. For example, if an employee on leave without pay would otherwise be entitled to full benefits (other than health benefits), the same benefits would be required to be provided to an employee on unpaid FMLA leave. By the same token, employers cannot use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions; **nor can FMLA leave be counted under "no fault" attendance policies.**

29 C.F.R. § 825.220(c) (emphasis added). *See also* 29 U.S.C. § 2652(b) ("The rights established for employees under this Act or any amendment made by this Act shall not be diminished by any collective bargaining agreement or any employment benefit program or plan."). Contrary to defendants' argument, there is no discretion permitted for the Company to decide whether to apply the "last step" of its attendance policy. An attendance policy which does not except as an "occurrence" an absence caused by a serious medical condition violates the Act. If an employee's last "occurrence" is due to a serious health condition within the Act, the Com-

---

**7.** As indicated above, this court can find no reference in the Company's handbook to medical leave and no reference to medical leave in its Flex Force Attendance Guidelines. Nor is there any "previous" quotation in the Brief pertaining to medical leave, reporting of an illness or characterizing medical leave as an "occurrence."

pany may not terminate the employee based upon its absenteeism policy. Fair or not, as seen through the eyes of the employer, this is the law.

### V.

For the above stated reasons, plaintiff's motion for summary judgment as to liability only is granted and defendants' motion is overruled. A status conference on the issue of damages is scheduled for **June 12, 1996 at 9:00 a.m. in Room 414 of the courthouse. Parties or their representatives with ultimate authority to settle this case on any terms are to attend in person.**

It is so ordered.